# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEANETTE GEISER and FRANK GEISER, her husband, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 09-164 Erie ) District Judge McLaughlin |
| UNITES STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon a motion to dismiss or, in the alternative, for summary judgment filed by the United States of America as Defendant. For the reasons which follow, Defendant's motion for summary judgment will be granted in part and denied in part.

### I. BACKGROUND

On July 16, 2006, Plaintiff Jeanette Geiser ("Geiser"), along with family and friends, arrived at East Branch Clarion River Lake, a reservoir located in Elk County, Pennsylvania. (Complaint ¶ 10). Geiser and her companions checked into a campsite at the East Branch Campground, a facility owned by Defendant and operated by the U.S. Army Corps of Engineers ("Army Corps"). (Complaint ¶¶ 5, 7). On July 17, 2006, while attempting to assist a seven year old family friend with the controls on a shower at the East Branch campground, Geiser slipped and fell on the wet floor surface, injuring her leg and ankle. (Complaint ¶¶ 15, 18).

The shower facility at issue had been constructed in 2005 by the Army Corps utilizing a steel trowel concrete surface on the shower stall floors. (Complaint ¶ 13). In this action, Geiser

1

asserts that the Army Corps failed to use reasonable care in the construction of the facility, resulting in her injuries.[1] Specifically, Geiser alleges that the use of a steel trowel finish on the floor, as opposed to a broom finish, created a dangerous condition as a result of the "smooth, glossy surface" and "lack of skid resistant surface" on the shower floor. (Complaint ¶¶ 16-17). Geiser also alleges that the Army Corps was negligent in failing to utilize skid resistant mats on top of the shower floor, failing to warn of the danger presented by the smooth floor, and violating various building codes and industry standards. (Complaint ¶ 17).

## II. STANDARD FOR REVIEW

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the jurisdiction of the court to address the merits of the plaintiff's suit. Fed.R.Civ.P. 12(b)(1). The plaintiff bears the burden of persuading the court that it has jurisdiction as compared to the burden of defendant under a Rule 12(b)(6) motion of convincing the court that plaintiff has failed to state a claim. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3rd Cir. 1991), cert. denied, 501 U.S. 1222 (1991). If a court concludes that it does not have subject matter jurisdiction over a case, it must dismiss the action. See Robinson v. Dalton, 107 F.3d 1018, 1020 (3rd Cir. 1997).

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

---

[1] Geiser's husband, Frank Geiser, has also asserted a claim for loss of consortium. (Complaint, Count II).

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed. R. Civ. P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3rd Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3rd Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3rd Cir. 1990) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3rd Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3rd Cir. 1982). Summary judgment is only precluded if the dispute

3

about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

## III. ANALYSIS

Geiser filed this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346, alleging that the Army Corps failed to use reasonable care in the construction of the concrete floor of the shower facility at the East Branch campground. Although a district court generally lacks jurisdiction over claims against the federal government, the FTCA serves as a waiver of sovereign immunity for torts involving "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b); Mitchell v. United States, 225 F.3d 361, 362 (3rd Cir. 2000). It is a plaintiff's burden to demonstrate that his or her claims fall within the scope of the FTCA's waiver of governmental immunity. In re Orthopedic Bone Screw Prod. Liab. Litigation, 264 F.3d 344, 361 (3rd Cir. 2001).

The FTCA also carves out an exception to governmental liability for certain discretionary acts performed by government employees:

> The provisions of this chapter . . . shall not apply to -
>
> (a) Any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680. This exception, known as the "discretionary function" exception, "was designed to keep the courts from 'second guessing,' through decisions in tort actions, the way that government officials choose to balance economic, social, and political factors as they carry out their official duties." Cope v. Scott, 45 F.3d 445, 449 (D.C. Cir. 1995). As such, the discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private

individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). It is the government's burden to prove that the discretionary function exception applies. Cestonaro v. United States, 211 F.3d 749, 756 n. 5 (3rd Cir. 2000).

In United States v. Gaubert, the United States Supreme Court set forth a two-part inquiry to guide the application of the discretionary function exception. Gaubert, 499 U.S. 315, 322-23 (1991); Mitchell, 225 F.3d at 363. First, a court must determine whether the act or conduct at issue involves "an element of judgment or choice." Gaubert, 499 U.S. at 322. Where a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow," see Gaubert, 499 U.S. at 322 (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)), then "the employee ha[s] no 'choice'" and the discretionary function exception does not apply. Cope, 45 F.3d at 448; 28 U.S.C. § 2680(a).

Secondly, if the challenged conduct does involve an element of judgment or choice, the court must then determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23. "[A] decision (or non-decision) must be reasonably related to a policy consideration to fall under the discretionary function exception." Cestonaro v. United States, 211 F.3d 749, 760 (3rd Cir. 2000). This second, "public policy" prong focuses on "the nature of the actions taken and whether they are susceptible to policy analysis" rather than on the subjective intent of the governmental actor. Gaubert, 499 U.S. at 325. Indeed, the very "touchstone of the second step of the discretionary function test is susceptibility to policy analysis." Cestonaro, 211 F.3d at 753 (citing Gaubert, 499 U.S. at 325). Thus, "[w]hat matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy." Gaubert, 499 U.S. at 325. The more "complex and politically sensitive the decision," and the "more it is connected to uniquely governmental functions," the more likely that it will be shielded as a discretionary function. Maalouf v. Swiss Confederation, 208 F.Supp.2d 31, 36-37 (D.D.C. 2002). Evidence of the actual decision "may be helpful in understanding whether the 'nature' of the decision implicated policy judgments,

but the applicability of the exemption does not turn on whether the challenged decision involved such judgments." Cope, 45 F.3d at 449.

Applying these principals to the instant case, the government argues that the Army Corps retained discretion to choose the finish for the concrete floor in the showers because no legislative act, binding specifications or building codes mandated a particular finish. The authority pursuant to which the Army Corps constructs, operates and maintains public parks and recreational facilities is granted by the Flood Control Act of 1944, 16 U.S.C. § 460d, which provides:

> The Chief of Engineers, under the supervision of the Secretary of the Army, is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army, to permit the construction of such facilities by local interests (particularly those to be operated and maintained by such interests), and to permit the maintenance and operation of such facilities by local interests.

16 U.S.C. § 460d. In determining the specifications of a structure such as the East Branch shower house, the Army Corps seeks guidance from the U.S. Army Corps of Engineers Unified Facilities Guide Specifications ("Specifications"). (Elwell Declaration, ¶ 6). Part 3.4 (of Section 03307A) of the Specifications provides guidelines as to "Concrete for Minor Structures" and allows for any of three different finishes for such structures: float, steel trowel and broom. (Elwell Declaration, ¶ 6; Defendant's Ex. 1A). The defendant argues that, because neither the Flood Control Act nor the Specifications mandate when a particular finish is to be used, discretion to choose between the three types of finish is left to the judgment of the Army Corps. In support of this position, it relies upon a Specification found in Part 3.4.3.2 which provides in relevant part:

> A trowel finish should be required only on building slabs to be left exposed or covered with tile. All other horizontal surfaces should be given a float finish, except when a non-skid finish is necessary, in which case it should be given a broom finish.

See Def. Ex. 1A, Part 3.4.3.2. The Army Corps contends, and I agree, that the guidance provided by this Specification is advisory because the use of the word "should" is properly interpreted as suggestive language, rather than mandatory. See, e.g., U.S. v. Swan, 275 F.3d 272, 278 (3rd Cir.

2002) (noting that use of the word "should" in a statute or regulation "ordinarily has a permissive meaning"); Aragon v. United States, 146 F.3d 819, 826 (10th Cir. 1988) (holding that the use of the word "should" is suggestive language, rather than mandatory language); In re Glacier Bay, 71 F.3d 1447, 1452 (9th Cir. 1995) (recognizing that regulations using suggestive terms such as "should" rather than mandatory terms such as "must" satisfy the discretionary prong).

Geiser counters that the Army Corps lacked the discretion to select a steel trowel finish because various building codes and other construction standards required the use of the broom finish. An expert report submitted by Geiser opines that the steel trowel finish produced a surface with a coefficient of friction lower than that required by International Building Code § 1003.4 and various local building codes. (See Report of Richard Hughes, June 28, 2008, ¶¶ 3, 5). Geiser relies on 40 U.S.C. § 3312(b)[2] and Greene v. United States, 207 F.Supp.2d 1113 (E.D. Cal. 2002), in support of the proposition that the Army Corps is obligated to comply with the aforementioned building codes. In Greene, the plaintiff, a visitor to a federal courthouse, tripped over a bronze statute in an outside courtyard and injured himself. Id. at 1120-21. Although the placement of the statute violated a local building code, the government argued that the decision as to where to locate the sculpture properly fell within the discretionary function exception. The court disagreed, holding that, because 40 U.S.C. §3312(b) and GSA regulations obligated the GSA to comply with applicable building codes, the discretionary function did not apply. Id. at 1122.

---

[2] 40 U.S.C. §3312(b) provides as follows:

> Building codes. - Each building constructed or altered by the General Services Administration or any other federal agency shall be constructed or altered, to the maximum extent feasible as determined by the Administrator or the head of the federal agency, in compliance with one of the nationally recognized model building codes and with other applicable national recognized codes, including electrical codes, fire and life safety codes, and plumbing codes, as the Administrator decides is appropriate. In carrying out this subsection, the Administrator or the head of the federal agency shall use the latest edition of the nationally recognized codes.

Even if 40 U.S.C. § 3312(b), as interpreted by the court in <u>Greene</u>, imposes a mandatory obligation on the part of the GSA or any other federal agency to comply with applicable building codes,[3] I find, for the reasons discussed below, that it is inapplicable.

Section 3301(a)(5)(A) of Title 40 provides in relevant part:

> **(5) Public building** – The term "public building" --
>
> > **(A)** means a building, whether for single or multitenant occupation, and its grounds, approaches, and appurtenances, which is generally suitable for use as office or storage space or both . . .

40 U.S.C. § 3301(a)(5)(A). The shower facility at issue here clearly is not a "public building" within the meaning of Section 3301(a)(5)(A) and the plaintiff does not contend otherwise. Rather, she argues in an Addendum to her Brief in Opposition to Defendant's Motion:

> In order to be exempted from the very broad building code compliance requirement that is set forth in § 3312(b), a particular building must fall within the exclusion that appears in § 3301(b), which provides that "[t]his chapter does not apply to the construction of any public building to which section 241(g) of the Immigration and Nationality Act (8 U.S.C. 1231(g)) or section 1 of the Act of June 26, 1930 (19 U.S.C. 68) applies." The referenced statutes relate only to certain facilities in which illegal aliens are detained. Therefore, the only buildings that are exempted from the building code compliance requirements are structures in which illegal aliens are detained. The narrow exemption would not apply to the present case because a campground shower facility is not used for detaining illegal aliens.
>
> In short, all buildings must comply with building code requirements pursuant to § 3312(b), with the exception of "public buildings" that are used for detaining illegal aliens. Since the narrow exception does not apply to a campground shower building, the shower building is subject to the building code compliance provision that appears in § 3312(b).

(Plaintiffs' Addendum, pp. 2-3). While the plaintiff is correct that § 3301(b) specifically exempts a class of structures that would otherwise qualify as "public buildings" from the requirements of

---

[3] It is unnecessary, in deciding the government's motion, to determine whether, as a matter of law, § 3312(b) mandates compliance with the applicable building codes and eliminates any discretion in that regard.

Chapter 33, it does not follow that all other buildings, including those that are not "public buildings" within the meaning of Section 3301(a)(5), must comply with the requirements of Section 3312(b).

Although the word "public" does not modify the word "building" in Section 3312(b), it is clear from the overall context and structure of Chapter 33 that it addresses only buildings that qualify as "public buildings" within the meaning of Section 3301(a)(5). It is axiomatic that "subsections of a statute must be interpreted in the context of the whole enactment." United States v. Cooper, 396 F.3d 308, 313 (3rd Cir. 2005). Thus, when "interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute." Kokoszka v. Belford, 417 U.S. 642, 650 (1974) (internal quotations omitted). Here, Title 40 is styled "Public Buildings, Property and Works," and Chapter 33 pertains to "Acquisition, Construction, and Alteration" of "Public Buildings and Works." Consequently, it would be unreasonable to assume that Congress intended Section 3312(b) to apply to structures that did not otherwise qualify as "public buildings" within the meaning of Chapter 33. I conclude, therefore, that the requirements of Section 3312(b) do not apply to the Army Corps' design and construction of the shower facility in this case.

In the absence of any binding legislative or agency guidelines compelling a particular finish for the concrete shower floor, I conclude that the Army Corps retained discretion to select a finish. See, e.g., Baum v. United States, 986 F.2d 716, 722 (4th Cir. 1993) (holding that "no mandatory law govern[ed] the design and construction} of guardrails in a national parkway and, therefore, the National Park Service's determination as to what type of guardrail to install on a bridge was discretionary); Cope, 45 F.3d at 451 (holding that the absence of any precise statutory or agency directives governing the decision whether to post warning signs in a the National Park Service rendered the decision "an exercise of discretion").

Having determined that the conduct at issue "involves an element of judgment or choice," I now examine whether that exercise of judgment "is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23.

The government contends that the Army Corps elected to utilize a steel trowel finish because of health concerns stemming from past difficulties with maintaining sanitation and cleanliness of rough surfaced cement floors. (Elwell Decl. ¶ 9). Specifically, the Army Corps asserts that, based on past experience, rough surfaced floors trap dirt and moisture, are more difficult to clean, and potentially breed germs and disease. (Id.) It contends that the decision to utilize a smooth surface involved a balancing of policy factors such as public health, safety, cleanliness and allocation of maintenance resources, all of which "squarely fits within the mission and mandate of the U.S. Army Corps of Engineers to construct, operate and maintain public parks and recreational facilities." (Defendant's Reply in Support, p. 8).

"'Determining whether a decision is essentially political, social, or economic' . . . is admittedly difficult, since nearly every government action is, at least to some extent, subject to 'policy analysis.'" Cope, 45 F.3d at 448. Despite the challenges inherent in such analyses, courts have consistently held that planning level decisions relative to design and construction of public structures or facilities generally implicate public policy concerns. For example, in Baum v. United States, the driver and passenger of a vehicle that struck a guardrail on a National Park Service parkway filed suit against the National Park Service alleging that the guardrails had been designed and constructed using inadequate materials. Baum, 986 F.2d at 722. The district court granted summary judgment in favor of the government based upon the discretionary function exception. Following an appeal, the Fourth Circuit affirmed, holding that "the choice of materials to be used in the guardrails is a choice of the type that normally involves consideration of public policy." Id. at 722. The Court explained:

> The question of what materials to use in such a project is also fundamentally described as a question of how to allocate limited resources among competing needs. Considered in this light, we are of opinion that the Park Service's decision in this regard plainly was one bound up in economic and political policy considerations. As the Court has stated in the related context of a regulatory agency, "[w]here Congress has delegated the authority ... to the executive branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no

> doubt that planning-level decisions establishing programs are protected by the discretionary function exception." Gaubert, 499 U.S. at ----, 111 S.Ct. at 1274. We think this idea equally applicable to the actions of an agency charged with administering a public works project, and we find the design and construction decisions in this case to be just the kind of planning-level decisions of which the Court spoke in Gaubert. Accordingly, we concur with the district court's dismissal of the claims related to design and construction.

Id. at 722 (internal citations omitted).

The Ninth Circuit reached a similar conclusion in ARA Leisure Services v. United States, 831 F.2d 193 (9th Cir. 1987), a case in which passengers and surviving family members brought suit after a tour bus went off a road in Denali National Park and rolled over, killing five passengers and injuring twenty-five more. The plaintiffs contended that the accident occurred, in part, because of the Park Service's negligence in designing the road without guardrails. The government argued that the decision not to install guardrails implicated esthetic and environmental policy concerns. In affirming the district court and finding that the design and construction of the road fell within the scope of the discretionary function exception, the Court stated:

> We agree that the Park Service's decision to design and construct Denali Park Road without guardrails was grounded in social and political policy. The government has shown a clear link between this decision and Park Service policies requiring that roads be designed to be "esthetically pleasing [and to] ... lie[ ] lightly upon the land utilizing natural support wherever possible." U.S. Dept. of Interior, "Compilation of Administrative Policies for National Parks and National Monuments of Scientific Significance" at 65. See Bowman v. United States, 820 F.2d 1393 (4th Cir.1987) (placement of guard rails and warning signs along national park scenic drive is discretionary function); see also Dalehite v. United States, 346 U.S. 15, 38-42 (1953) (holding that alleged negligence in manufacture of fertilizer fell within exception because manufacturer followed specifications and plans adopted as policy matter with exercise of expert judgment). We therefore affirm the district court's ruling that the decision to design and construct Denali Park Road without guardrails is protected by the discretionary function exception.

ARA Leisure Services, 831 F.2d at 195.

In Cope, the plaintiff was traveling along Beach Drive, a narrow, two-lane road located in an urban park in Washington, D.C., when struck by a sliding vehicle while rounding a curve. Cope, 45 F.3d at 447. Cope filed suit against the National Park Service alleging that the road had been negligently designed, constructed, and maintained, resulting in a "polished" surface and unacceptable "skid-resistance levels." The government argued that the Park Service's "failure to maintain adequate skid resistance" fell within the discretionary function exception because the design and maintenance of the road involved the balancing of various public policy concerns. After the district court granted summary judgment in favor of the government, the D.C. Circuit affirmed, holding that the discretionary function exception precluded liability:

> The state of Beach Drive alleged by Cope could have been prevented only by reducing the traffic load, initially paving it with a different surface, resurfacing the curve entirely, or at least milling the curve to create grooves in the surface. Determining the appropriate course of action would require balancing factors such as Beach Drive's overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards. These balances are apparent throughout the 1988 study that placed maintenance on this section of Beach Drive in the middle of a priority list of work that needed to be done on eighty different sections of park roads. Park Service decisions regarding the management of Beach Drive are therefore much like the decisions exempted by the Supreme Court in Varig: "[S]uch decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." 467 U.S. at 820, 104 S.Ct. at 2767. And, as in Varig, we decline to "second guess" those judgments here.

Cope, 45 F.3d at 451 (citing United States v. S.A. Empresa de Ciacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 820 (1984)) (additional internal citations omitted).

Finally, in Bowman v. United States, 820 F.2d 1393 (4th Cir. 1987), the Court held that the National Park Service's decision as to the placement of a guardrail was shielded by the discretionary function exception. In reaching its decision, the Court noted the many policy factors inherent in such decisions:

> National Park Service officials have more than safety in mind in determining the design and use of man-made objects such as guardrails and signs along the Parkway. These decisions require balancing many factors: safety, aesthetics, environmental impact and available financial resources. In making each decision these factors must be weighed carefully in accordance with the policies of the National Park Service. The stretch of highway in question was straight, the cleared vista and steep slope were open and obvious. The evidence indicates that some thirty years ago the Government considered installing a guardrail at Milepost 319.6 but elected not to do so. Whether that decision grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known. What is obvious is that the decision was the result of a policy judgment. One can argue that another policy, which places greater emphasis upon safety, is more desirable. However, by the discretionary function exception, Congress intended to prevent courts from second-guessing federal policy.

Bowman, 820 F.2d at 1395.

Here, the Army Corps' decision to utilize a smooth steel trowel finish on the concrete shower floors was grounded in the same type of policy considerations discussed in the preceding cases. In exercising its discretion to design a shower facility with a steel trowel finish on the concrete shower floor, the Army Corps was required to balance various policy factors such as safety, sanitation, public health, and cost of maintenance. This type of planning falls squarely within the scope of the Army Corps' mandate to provide safe and healthy recreational facilities near federal public reservoirs. Although Geiser argues that the Army Corps should have placed a greater emphasis on safety by selecting a broom finish, this is precisely the type of policy decision which courts should not second guess. See Bowman, 820 F.2d at 1395 ("One can argue that another policy, which places greater emphasis upon safety, is more desirable. However, by the discretionary function exception, Congress intended to prevent courts from second-guessing federal policy."); Cope, 45 F.3d at 451 ("Determining the appropriate course of action would require balancing factors such as Beach Drive's overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards.").

Accordingly, for the reasons previously discussed, I conclude that the Army Corps' decision to construct the shower floor with a steel trowel surface falls within the discretionary function exception to the FTCA's waiver of sovereign immunity.[4]

### IV. CONCLUSION

For the foregoing reasons, the Army Corps of Engineers decision to utilize a smooth steel trowel finish on the floor of the shower facility in the East Branch Campground falls within the discretionary function exception to the FTCA's waiver of sovereign immunity. As such, the government's motion to dismiss or, in the alternative, for summary judgment is granted as to this aspect of Geiser's negligent construction claim. The government's motion is denied as to Geiser's remaining claims based upon an alleged failure to warn and failure to provide non-skid matting.

---

[4] As discussed above, Geiser also alleges that the Army Corps of Engineers is liable for failing to post adequate warning signs and to place skid-resistant mats on the floor. At oral argument, the government made clear that it was not seeking dismissal of either of those claims on the basis of sovereign immunity as it conceded that they did not implicate the discretionary function exception. (Transcript, Hearing on Motion to Dismiss, pp. 15-17). Rather, the government contends that it cannot be liable for failing to take the precautions that Geiser suggests because it had no knowledge of the potential danger presented by the shower floor. This argument is more appropriately addressed through a Rule 56 motion on a more fully developed record.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEANETTE GEISER and FRANK GEISER, her husband, )<br>)<br>Plaintiffs, )<br>v. )<br>)<br>UNITES STATES OF AMERICA, )<br>)<br>Defendant. )<br>)<br>) | C.A. No. 09-164 Erie<br>District Judge McLaughlin |

## **ORDER**

AND NOW, this 28th day of September, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment is GRANTED in part and DENIED in part.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___